FILED
U.S. DISTRICT COURT
STATESBORO DIV.

2014 SEP -9 PM 5: 51

CLERK_____
SO. DIST. OF GA.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *Ex rel.* JAMIE NESBITT, and STATE OF GEORGIA, *ex rel.* JAMIE NESBITT, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL ACTION NUMBER: CV 6:14-094 |
| CANDLER COUNTY, GEORGIA d/b/a CANDLER COUNTY AMBULANCE SERVICE, | ) ) ) ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Comes Now Qui tam relator Jamie Nesbitt ("Nesbitt" or "Relator"), who amends his Complaint prior to the filing of any responsive pleading pursuant to Federal Rule of Civil Procedure 15 (a)(1) and (a)(2) by deleting as the named defendant Candler County Hospital Authority d/b/a/ Candler County Ambulance Service and adding as the named defendant Candler County, Georgia d/b/a Candler County Ambulance Service and sets forth claims under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and the Georgia False Medicaid Claims Act ("GFMCA") O.C.G.A. § 49-4-168.1 *et seq.*, on behalf of the United States of America and the State of Georgia against Defendant Candler County, Georgia d/b/a Candler County Ambulance Service, ("Defendant" or "Candler County"). Relator's allegations are based upon his own knowledge and upon an investigation undertaken by him through counsel.

1

## I. <u>NATURE OF THE CASE</u>

1.      This qui tam action is an effort to restore to the United States and the State of Georgia millions of dollars Defendant has taken through a systemic and longstanding fraud, perpetrated through the Medicare and Medicaid programs.

2.      Ambulance transport is only covered by Medicare or Medicaid where it is "medically necessary" as defined by the relevant regulations. At all relevant times, Defendant engaged in a fraudulent scheme to bill Medicare and Medicaid for ambulance transport that was not medically necessary, by submitting claims for payment for ambulance services which failed to qualify as such. The fraud alleged herein began over two years ago, and continues.

## II. <u>PARTIES</u>

3.      Defendant Candler County, Georgia operates the Candler County Ambulance Service.  The Defendant is subject to the jurisdiction of this Court.

4.      Relator Jamie Nesbitt is a natural person residing in the state of Georgia. Mr. Nesbitt was an EMT employed by Candler County Ambulance Service from October 2006 until his unlawful termination on March 21, 2014.

5.      The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein -- Medicare claims in full and Medicaid claims in part -- and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

6.      The State of Georgia is a real party in interest under the GMFCA and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

2

### III. JURISDICTION AND VENUE

7.     Relator brings this action on behalf of the United States under the qui tam provisions of the FCA, and the State of Georgia under the GMFCA.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the count asserted under state law pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

9.     This Court has personal jurisdiction over Defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendant transacts business and committed violations of 31 U.S.C. § 3729 in this District.

10.     This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A) and the Georgia Medicaid False Claims Act (GMFCA).

11.     To the extent there has been a public disclosure unknown to Relator, he is an original source under all relevant statutory provisions. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which his allegations are based and/or has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## IV. <u>RELEVANT STATUTES AND REGULATIONS</u>

### A. <u>THE FALSE CLAIMS ACT</u>

12.    The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

13.    The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

14.    The FCA also imposes liability on any person who conspires to commit false claims or false statements ("conspiracy claim"). 31 U.S.C. § 3729(a)(1)(C).

### B. <u>THE GEORGIA MEDICAID FALSE CLAIMS ACT</u>

15.    The GMFCA makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment under the Medicaid program. O.C.G.A. § 49-4-168.1 (a)(1). The GMFCA also prohibits knowingly making, using, or causing to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid or

4

approved. O.C.G.A. § 49-4-168.1 (a)(2). The GMFCA further prohibits conspiracies to defraud Medicaid. O.C.G.A. § 49-4-168.1 (a)(3). Finally, the GMFCA prohibits knowingly making, using, or causing to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to Medicaid. O.C.G.A. § 49-4-168.1 (a)(7).

**C.   MEDICARE AND MEDICAID'S REQUIREMENT THAT AMBULANCE TRANSPORT BE "MEDICALLY NECESSARY" AND PROPERLY DOCUMENTED**

16.     Medicare and Medicaid both provide payment for transport by ambulance only where that transport is "medically necessary." *See* 42 C.F.R. § 410.40(d); 42 C.F.R. § 455.2 *et seq*. Medicare provides that ambulance transportation is medically necessary where "the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." 42 C.F.R. § 410.40.

17.     Certain transports are more expensive than others. Among other criteria, the provision of Advanced Life Support ("ALS") services allows a provider to submit a significantly larger bill to Medicare than the provision of Basic Life Support ("BLS") services, because ALS services must be performed by EMT-Intermediates or by paramedics (collectively, "ALS Personnel"), who have higher levels of training than do the EMT-Basics who are able to provide BLS services.

18.     Just as the provision of any service whatsoever must be medically necessary, the provision of ALS, as opposed to BLS, service must be justified. Medicare regulations provide that "[t]he beneficiary's condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary." 42 C.F.R. § 410.40.

5

19.    Medicare further requires that any provision of ALS services must include an "ALS assessment." An ALS assessment is only medically necessary where "the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment." 42 C.F.R. § 414.605 ALS crews, in turn, are:

> [I]ndividual[s] trained to the level of the emergency medical technician-intermediate (EMT-Intermediate) or paramedic. The EMT-Intermediate is defined as an individual who is qualified, in accordance with State and local laws, as an EMT-Basic and who is also qualified in accordance with State and local laws to perform essential advanced techniques and to administer a limited number of medications. The EMT-Paramedic is defined as possessing the qualifications of the EMT-Intermediate and also, in accordance with State and local laws, as having enhanced skills that include being able to administer additional interventions and medications. *Id.*

20.    Medicare's provider manual explicitly requires that ambulance providers maintain documentation showing the medical necessity of all transports. Specifically, Medicare's Benefit Policy Manual1 ("Medicare Manual"), states:

> In all cases, the appropriate documentation must be kept on file and, upon request, presented to the carrier. It is important to note that neither the presence nor absence of a signed physician's order for an ambulance transport necessarily proves (or disproves) whether the transport was medically necessary. The ambulance service must meet all program coverage criteria in order for payment to be made.

Medicare Manual 10.2.4. Medicaid programs have similar requirements.

## D. COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT UNDER BOTH PROGRAMS

21.    To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting documentation to Medicare.2 Among other things, that form provides "additional requirements that [] supplier[s] must meet and maintain in order to bill the Medicare program." These requirements, which are pre-requisites to payment under Medicare, include a certification that: "I

agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier . . . *I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.*" CMS-855B, at 31 (emphasis added). The provider also certifies that "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.*

22.     Similarly, Medicaid regulations require that all provider claim forms include the following statements near the provider's signature: "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment of this claim will be from Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R. § 455.18

23.     Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA and the GMFCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements. Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA and GMFCA.

## V. **DEFENDANT'S FRAUDULENT CONDUCT**

### A. **BACKGROUND**

24.     In the medical transport business, the Emergency Medical Technicians ("EMTs") that accompany a vehicle fill out what is known colloquially as a "Patient Care Report" or

"Patient Care Report." (PCR) These Patient Care Reports include information such as the date, time, and location of an ambulance pick-up and drop-off, check boxes to describe various conditions that may typically affect an ambulance patient (for example a check box for "stroke" or "heart attack"), and a box for a "narrative." The narrative is simply the EMT's account of what happened during transport.

25.    At Candler County Ambulance Service, Patient Care Reports are laid out such that there is a box labeled "Reason for Transport" in which the EMTs are to document the reasons transport by ambulance was medically necessary for the patient.

26.    In addition, non-emergency, scheduled transport is documented by a Certificate of Medical Necessity ("CMN"). That document is to be filled out by the hospital, patient's physician, or in some instances, a nurse. Like the Patient Care Reports, the CMNs document, among other things, the medical necessity of transport by ambulance.

27.    Patient Care Reports and CMNs are not submitted to Medicare or Medicaid, but are required to be kept by the service provider for a period of five years in case Medicare or Medicaid requires more information regarding a particular transport.

## B. FALSIFICATION OF PATIENT CARE REPORTS - GENERALLY

28.    During his tenure at Candler County Ambulance Service, Relator was often dispatched to transport patients to or from nursing homes, doctors' appointment and hospitals. Often, Relator and his EMT partner would be confronted with a patient who plainly did not need to be transported by ambulance. Indeed, some patients were so ambulatory that they were able to walk to the ambulance and enter unassisted.

29.    Nevertheless, the nursing staff at the hospital or nursing home would check "non-ambulatory" on the CMN as a basis for transport by ambulance. On occasion, Relator would

transport a patient from a nursing home, or hospital by ambulance when the patient could easily have been transported by wheelchair van.

30.     On occasions where the patient clearly did not need an ambulance, Relator, unable to determine any medical necessity for the transport, would write in the Narrative the supposed reason for the transport, but would include his actual findings that the patient was, for instance, ambulatory. Relator was inevitably reprimanded by his superior.

31.     When Relator would put the actual condition of the patient, in other words, indicating that the patient did not need emergency transport, his supervisor would tell him to change the Patient Care Report. Relator was told by his supervisor to change the Patient Care Report to find a reason that ambulance transport was medically necessary.

32.     Relator's supervisor repeatedly reprimanded him for not justifying the ambulance transport as medically necessary on Patient Care Reports.

## C. FALSIFICATION OF PATIENT CARE REPORTS REGARDING FACILITY TO FACILITY TRANSFERS

33.     In addition to the wrongdoing outlined above, Candler County Ambulance Service would frequently treat hospital to hospital transfers as ALS transfers.

34.     The hospital to hospital transport was billed as ALS transport, even though it was not medically necessary and the Patient Care Report would be falsified to reflect medical necessity.

## D. CONTINUED FALSIFICATION OF REPORTS AND SUBMISSION OF FALSE CLAIMS

35.     At Candler County Ambulance Service, when an ambulance crew returns from their shift, they submit their Patient Care Reports and CMNs to the supervisor. That supervisor

would review the Patient Care Reports and CMNs, and then submit them to EMS Consultants (EMS) in Statesboro, Georgia who would review the Reports for medical necessity.

36.     Patient Care Reports that were not approved by EMS were returned to Candler County Ambulance Service and the supervisor would instruct the relevant employee to either falsify the Patient Care Reports, so that it would qualify as an emergency trip. *Any time a Patient Care Report contains information that would indicate Medicare should not pay for the transport -- for example, by stating "patient was able to walk without assistance" -- the supervisor instructs the EMTs to not include that information on the report. The supervisor would state - we can't bill for this, so we have to change the report - or words to that effect.*

37.     Similarly, any time a Patient Care Report contains information that contradicts a CMN, the supervisor returns the Patient Care Report to the EMT or, and direct them to change the Report, so that it matches the CMN. *This occurs even on occasions where the CMN is plainly incorrect.*

38.     In addition to instructing the EMTs to change the reports, the supervisor would physically change the reports by changing the reports on the computer, then cut and paste the signatures from the original report, so that his changed report would have the original signatures of the EMT.

39.     The falsification of Patient Care Reports is done on a routine basis.

40.     Relator recalls an incident where a Patient Care Report reflected that a patient had walked into an ambulance, but he was instructed to change the report to indicate that the patient was bed-confined.

41.     Donald Greer, the Deputy Director of Candler County EMS specifically instructed relator and other EMTs on how to submit create false claims to be submitted to

10

Medicare and Medicaid. Those instructions included an absolute prohibition on stating that patients could walk, because Medicare would not pay such claims. This was despite the fact that paramedics and EMTs indicated that patients could walk on the Patient Care Report. EMTs who questioned this practice were reprimanded or fired.

42.     Relator believes that virtually all of the Patient Care Reports were falsified in order to meet the Medicare reimbursement guidelines. Candler County's fraud has gone on for years, and shows no signs of stopping.

## COUNT ONE - FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(A) AND (B)

43.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 42 of this Complaint as if set forth herein at length.

44.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

45.     As a result of the misconduct alleged herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

46.     As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

47.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

48.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

11

## COUNT TWO - GEORGIA MEDICAID FALSE CLAIMS ACT
## GA. CODE § 49-4-168.1 *ET SEQ.*

49.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 48 of this Complaint as if set forth herein at length.

50.     This is a claim for treble damages and civil penalties under the Georgia Medicaid False Claims Act, brought pursuant to O.C.G.A. § 49-4-168.1.

51.     As alleged herein, Defendant violated O.C.G.A. § 49-4-168.1 in at least the following respects:

        a.      In violation of subparagraph (a)(1) Defendant presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing such claim is false or fraudulent; and

        b.      In violation of subparagraph (a)(2) Defendant made, used, or caused to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false.

52.     The State of Georgia, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so.

53.     By reason of these payments, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT THREE – RETALIATORY
## DISCHARGE IN VIOLATION OF § 3730 (h)

54.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 53 of this Complaint as if set forth herein at length.

55.     Relator was engaged in protected activity under 31 U.S.C. 3730 § (h) as set forth above.

56.    Defendant was aware of Mr. Nesbitt's protected conduct, as alleged above.

57.    In retaliation for Mr. Nesbitt's protected conduct, the Defendant discharged Mr. Nesbitt from his employment with the Candler County Ambulance Service in violation of 31 U.S.C. § 3730 (h).

58.    As a direct and proximate cause of his unlawful discharge from Defendant, Mr. Nesbitt has suffered financial loss in the form of lost wages, bonuses, and employment benefits in a sum to be proven at trial.

59.    Pursuant to 31 U.S.C. § 3730 (h), Mr. Nesbitt is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against the Defendant, ordering that:

A.    Defendant cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and the Georgia Medicaid False Claims Act, O.C.G.A. § 49-4-168.1;

B.    Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

C.    Defendant pay the State of Georgia not less than $5,000 and not more than $25,000 for each violation of the Georgia Medicaid False Claims Act, plus three times the amount of damages the State of Georgia has sustained because of Defendant's misconduct;

13

D.      Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and O.C.G.A. § 49-4-168.1;

E.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), O.C.G.A. § 49-4-168.1, and any other applicable law or regulation;

F.      Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court;

G.      Defendant pay relator judgment on his retaliation claim pursuant to 31 U.S.C. § 3730 (h) and be awarded two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and

H.      The United States, the State Georgia, and Relator be awarded such other,

further or different relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Relator hereby demands trial by jury.

This 9th day of September, 2014.

_____

Thomas A. Withers, Esq.
Georgia Bar Number: 772250


GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:  (912) 629-6347
E-Mail: Twithers@gwllawfirm.com



Attorney for Relator